# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

BRONSON A. LOPEZ,

      Plaintiff,

      v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.

_____/

Case No.  1:13-cv-00741-SKO

**ORDER REGARDING PLAINTIFF'S COMPLAINT**

**(Docs. 16, 22, 23)**

## I.  BACKGROUND

Plaintiff Bronson Lopez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 405(g), 1383(c)(3).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

_____

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 8, 10.)

## II.  FACTUAL BACKGROUND

Plaintiff was born in 1971, completed high school, and previously worked as a caregiver, groundskeeper, hacker (laying floor tiles), and stocker.  (Administrative Record ("AR") 19, 48.) On September 16, 2010, Plaintiff filed an application for DIB and SSI benefits.  (AR 12.)

### A.    Relevant Medical History

Plaintiff's medical records begin in May 22, 2009, when he presented to Community Medical Centers ("Community") for psychiatric medication refills in May and then June 2009. (AR 221, 223.)  Plaintiff complained of a history of anxiety and depression.  (AR 221, 223.)  The Community doctor screening Plaintiff for his refills in June 2009 described him as alert, "oriented times three," and in no acute distress, and recommended follow up in one to two months.  (AR 223.)

Plaintiff next returned for medical care on December 31, 2010, when Mary Lewis, Psy.D., conducted a psychiatric evaluation.  (AR 229-34.)  Plaintiff complained to Dr. Lewis of daily depression and anxiety, but denied suicidal ideation or history of psychiatric hospitalization.  (AR 229-31.)  Plaintiff said he had problems breathing, felt sad, and could not do anything.  (AR 229.) Plaintiff reported that in a typical day he goes for a walk, watches television, and performs household chores such as washing dishes, cooking, and doing laundry.  (AR 233.)  Plaintiff said he had no friends, and denied a history of getting into physical altercations.  (AR 233.)

Dr. Lewis described Plaintiff as pleasant and cooperative with good eye contact and appropriate facial expressions.  (AR 229, 231.)   Plaintiff exhibited a euthymic mood and appropriate affect.  (AR 231.)  He had normal thought processes, intellectual functioning, and judgment. (AR 231-32.)   He did not display any signs of hallucinations or delusions.   He demonstrated satisfactory memory, attention, and concentration.  (AR 232-33.)  For example, he performed addition, subtraction, and multiplication satisfactorily.   He successfully completed recent memory recall drills.  (AR 232-33.)

Plaintiff told Dr. Lewis he previously worked for ten years as an in-home care provider. (AR 230.)  He last worked as a gardener at Fresno City College from 2007 to 2008, during which he reportedly had a good working relationship with his boss and co-workers, but stopped working

1  because the program terminated.  (AR 230.)  Plaintiff told Dr. Lewis he was not willing to work
2  in any job position, was not actively seeking employment, and was not involved in a retraining
3  program.  (AR 230.)  Plaintiff explained to Dr. Lewis, "I can't work because I have a lot of fear."
4  (AR 229.)

5      Dr. Lewis opined that Plaintiff had no psychiatric diagnoses.  (AR 233.)  The doctor
6  assigned a Global Assessment of Functioning ("GAF")[1] score of 65.  She noted Plaintiff's
7  "reported symptoms of depression and anxiety are not typical of a major mental disorder. Despite
8  [Plaintiff's] reported symptoms and history, he does not appear to be suffering from a major
9  mental disorder."  (AR 233.)  Dr. Lewis commented, "[f]rom a mental health standpoint, the
10  claimant appears to be able to function adequately."  (AR 233.)  Plaintiff had no significant
11  limitation in his ability to understand and remember very short and simple instructions;
12  understand and remember detailed instructions; maintain concentration and attention; accept
13  instructions from supervisors and respond appropriately; sustain an ordinary routine without
14  special supervision; complete a normal workday and work week without interruptions at a
15  consistent pace; interact with coworkers; or deal with various changes in the work setting.  (AR
16  233-34.)  Dr. Lewis assessed the likelihood that Plaintiff would emotionally deteriorate in a
17  work environment as minimal.  (AR 234.)

18      On January 23, 2011, State agency psychiatric consultant, Patrice G. Solomon, Ph.D.,
19  reviewed Plaintiff's record and evaluated Plaintiff's condition by completing a Psychiatric Review
20  Technique form.    (AR 237-50.)  Dr. Soloman noted Plaintiff had no prior psychiatric
21  hospitalizations and a normal mental status exam with no evidence of hallucinations.  Dr. Soloman
22  affirmed Dr. Lewis' findings and opined Plaintiff had no medically determinable mental
23  impairment.  (AR 237.)

24

25

---

26  [1] The GAF represents an examiner's judgment of the individual's overall level of psychological functioning.  A
    person's GAF score is based on a numerical rating ranging between 0 and 100.  A GAF of 61-70 indicates "[s]ome
27  mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school
    functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some
28  meaningful interpersonal relationships."  *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental
    Disorders, 4th text revision, 2000, pp. 32, 34.

1      On February 18, 2011, Plaintiff again sought treatment at Community with complaints of

2  anxiety and panic attacks.  (AR 252, 305.)  Plaintiff told Daniel DaSilva, M.D., that he had a

3  history of polysubstance abuse when he was a child.  (AR 252.)  Plaintiff was "afraid to go to

4  sleep [because] I might not wake up."  (AR 252.)  He heard voices, had visual hallucinations, and

5  believed people tried to hurt him, but he denied suicidal or homicidal ideation.  (AR 252.)  Dr.

6  DaSilva diagnosed Plaintiff with depression with psychotic features.  (AR 252.)  The doctor noted

7  Plaintiff might have paranoid schizophrenia and referred him to a county program to evaluate his

8  need for medication.  (AR 252.)

9      On March 10, 2011, Plaintiff received an initial consultation at Fresno County Mental

10  Health ("Mental Health") with Larry Gay, L.C.S.W.  (AR 270.)  Plaintiff complained of

11  depression, anxiety, social paranoia, and auditory hallucinations.  (AR 270.)  He reported

12  decreased ability to attend to activities of daily living due to daily feelings of sadness and

13  hopelessness.  (AR 270-71.)  He again denied suicidal or homicidal ideation.  (AR 271.)  Plaintiff

14  told Mr. Gay he had received treatment for depression and anxiety for the previous three years,

15  but never divulged his auditory hallucinations due to fear, and never received treatment for

16  auditory hallucinations or psychosis.  (AR 271.)  Plaintiff denied any psychiatric or suicidal

17  episodes.  (AR 271, 276.)

18      Mr. Gay described Plaintiff as tense and suspicious, yet calm, cooperative, and "oriented

19  times four."  (AR 273.)  Mr. Gay described Plaintiff's appearance as "within cultural norms," but

20  noted Plaintiff exhibited a depressed and panicky mood with flat and congruent affect and slowed

21  speech.  (AR 273.)  He had focused, coherent thought flow with fair memory, judgment, and

22  insight.  (AR 274.)  Mr. Gay opined Plaintiff was a low risk to himself and others, and

23  recommended medication, as well as individual and group therapy for one year.  (AR 270, 274.)

24  He assigned Plaintiff a GAF of 45.[2]  (AR 274.)

25

26

---

27  [2] A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, sever obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep

28  a job)."  *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 4th text revision, 2000, pp. 32, 34.

Also on March 10, 2011, Homer LeRoy Ramsey, M.D., examined Plaintiff.  (AR 276-78.)  Dr. Ramsey also described Plaintiff as cooperative, alert and oriented with an organized thought process, normal judgment, and average intelligence.  (AR 277.)  He noted Plaintiff exhibited a depressed and anxious mood with flat affect.  Contrary to Mr. Gay's observations, however, the doctor described Plaintiff as well-groomed with normal speech.  (AR 277.)  Plaintiff described hallucinations, helplessness/hopelessness, and worthlessness.  (AR 277.)  He was hearing voices all the time, which were trying to hurt him and told him to watch out.  (AR 266.)  Dr. Ramsey diagnosed Plaintiff with a psychotic disorder not otherwise specified ("NOS") and polysubstance dependence.  (AR 277.)  He opined that Plaintiff's mental illness might have been caused by drugs, but might also be a primary disorder, and recommended medication changes with a follow-up appointment in two to three weeks.  (AR 278.)

At a follow up appointment with Dr. Ramsey on April 6, 2011, Plaintiff indicated medication improved his anxiety and sleep, but he still suffered from symptoms.  (AR 268.)  Dr. Ramsey indicated Plaintiff had "impaired judgment with severe chronic mental illness that was probably exacerbated by drugs but it may very well be primary and is not going away and is disabling."  (AR 268.)   He noted however, that Plaintiff's condition improved with treatment.  (AR 268.)  During this visit, Dr. Ramsey diagnosed Plaintiff with psychotic disorder NOS, as well as "schizophrenia, paranoid type, chronic (rule-out)."  (AR 268.)  He assigned Plaintiff a GAF of 46 and recommended increasing medication dosages with follow up in eight weeks. (AR 269.)

On April 25, 2011, Plaintiff saw Robert Oldham, M.D., as a walk-in patient.  (AR 266.)  Plaintiff reported continued auditory and visual hallucinations, panic attacks, and social phobia.  (AR 266.)  Upon examination, Dr. Oldham described Plaintiff as well-groomed, cooperative, alert, and oriented with normal speech, and cognition.  (AR 266.)  The doctor noted Plaintiff seemed to understand he has a mental illness, needed treatment, and could express a basic understanding of the risk, benefits, and alternatives of his medication.  (AR 266.)  He diagnosed Plaintiff with psychotic disorder NOS and social phobia, adjusted his medications, and recommended follow up in six weeks or less.  (AR 267.)

1        From late April through November 2011, Plaintiff saw Dr. Oldham for anxiety, paranoia,

2   and hallucinations.  (AR 261-64, 266-67, 281-88.)  During this time, Dr. Oldham noted Plaintiff's

3   condition improved with treatment (AR 262, 264, 285, 287), and Plaintiff denied any side effects

4   from his medication (AR 261, 263, 266, 281, 283, 285, 287).  Plaintiff also denied suicidal or

5   homicidal ideation.  (AR 261, 263, 266, 281-83, 285, 287.)

6        In May 2011, Plaintiff reported reduced paranoia and hallucinations.  (AR 261, 263.)  He

7   attended group therapy and planned to go back, and also found breathing exercises and

8   meditation helpful in reducing his anxiety.  (AR 263.)   In June 2011, Plaintiff reported he left the

9   house more often.  (AR 261.)  He still had auditory hallucinations and felt depressed, but reported

10  improvement with medication.   (AR 261.)   Dr. Oldham noted Plaintiff could express his

11  frustrations and accept feedback regarding his cognitive distortions.  (AR 261.)  Six months later,

12  in October and November 2011, Plaintiff reported the medications had improved his

13  hallucinations and paranoia, and he could get out of his "comfort zone" more often.  (AR 281,

14  283.)  His relationships with others had improved, such that he planned on volunteering and

15  wanted to get a dog.  (AR 281, 283.)  Plaintiff exhibited a more upbeat mood.  (AR 283.)

16       Over the course of Plaintiff's treatment, Dr. Oldham diagnosed Plaintiff with psychotic

17  disorder NOS, personality disorder, and social phobia (AR 262, 264, 267, 282, 285, 287).  He

18  assigned a GAF of 46.  (AR 287.)  He recommended Plaintiff continue medication and participate

19  in behavioral activation, individual and group psychotherapy, and follow up in one to two

20  months.  (AR 262, 264, 267, 282, 285-88.)  Plaintiff refused to participate in psychotherapy, but

21  told the doctor he would participate in behavioral activation.  (AR 284-85.)

22       On May 4, 2011, State Agency psychological consultant, A. Garcia, M.D., reviewed

23  Plaintiff's medical record and affirmed Dr. Soloman's January 2011 assessment that Plaintiff did

24  not have a medically determinable mental impairment.  (AR 257-58.)

25       On July 1, 2011 Plaintiff attended group therapy for his depression symptoms.  (AR 260.)

26  The group leader reported Plaintiff sat quietly and listened.  (AR 260.)  He exhibited restricted

27  affect, but made comments when questioned.  At the end of group, Plaintiff told the group leader

28  that he enjoyed the session and was glad he attended.  (AR 260.)

On October 21, 2011, Firdose Gill, D.O., saw Plaintiff for anxiety and prescription refills. (AR 296, 298.)  Plaintiff denied prior hospitalizations for psychological conditions.  (AR 298.) Upon exam, Dr. Gill described Plaintiff as alert and oriented times three and in no acute distress. (AR 299).   Plaintiff denied suicidal ideation.   (AR 300.)   Dr. Gill recommended increasing Plaintiff's Klonopin dosage and follow up in three to four months.  (AR 300.)

On January 3, 2012, Dr. Oldham completed a mental impairment questionnaire at Plaintiff's request.  (AR 290-94.)  Dr. Oldham diagnosed Plaintiff with psychotic disorder NOS and social phobia.  (AR 291.)  He assigned Plaintiff a GAF of 50 and indicated he had treated Plaintiff monthly with anti-psychotic anti-depressant and anti-anxiety medications.  (AR 291.) He noted Plaintiff had a partial response to this treatment, with no side effects to the prescribed medications.    (AR 291.)    Plaintiff had a fair diagnosis if he adhered to treatment recommendations.  (AR 291.)

In a check-box list, Dr. Oldham opined Plaintiff had marked limitations in activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace.  (AR 292.)   Plaintiff had difficulty thinking or concentrating, an impaired memory, intense and unstable interpersonal relationships, deeply ingrained maladaptive patterns of behavior, and emotional withdrawal or isolation.  (AR 292.)  Plaintiff had no episodes of decompensation within a 12-month period, but even a minimal increase in mental demands or change in environment would cause Plaintiff to decompensate.  (AR 293, 294.)  Plaintiff's impairment or treatment would cause him to be absent from work about four days per month and could be expected to last at least 12 months.  (AR 294.)  Plaintiff would have difficulty working at a regular job on a sustained basis because he is distrustful of others, has difficulty in groups of people, and has a "hard time staying on."  (AR 294.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's SSI and DIB applications initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 54, 64, 74, 80, 99.)  On April 18, 2012, the ALJ held a hearing during which Plaintiff testified, represented by counsel.  (AR 26-53.)

1        **1.      Plaintiff's Testimony**

2        Plaintiff testified he graduated from high school.  He currently lives in the back room of a

3    house occupied by his sister and her two children.  (AR 30.)  He spends most of his time in his

4    room, and tries to read and do a little exercise during the day.  (AR 30.)  He has not had a driver's

5    license about five years, after it was suspended for driving under the influence ("DUI").  (AR 31.)

6    Plaintiff's neighbors drove him to the hearing.  (AR 31.)

7        On a typical day, Plaintiff wakes up, makes something to eat, and tries to get out for a

8    walk.  He waters the plants and trees, which, along with breathing exercises, calms him.  (AR 45.)

9    He watches television two or three hours a day.  (AR 45.)  He has no friends but greets his family

10   members if he sees them.  (AR 45-46.)  Plaintiff cleans his toilet and sink.  He reads, but needs

11   breaks because he gets tired and cannot see very well.  (AR 46.)

12       Plaintiff was previously the in-home care provider of a relative for about 10 years.  (AR

13   42.)  He last worked five or six years ago at Fresno City College through a disability jobs program

14   watering plants.  (AR 32, 41.)  He worked about 16-20 hours a week, but the program was

15   discontinued.  (AR 42.)  At one point, Plaintiff applied for unemployment over the phone.  (AR

16   43.)  Plaintiff has applied for part time nursery work at three different nurseries and a hardware

17   store since his job at Fresno City College was terminated.  (AR 47.)  None of the venues offered

18   him a job.  (AR 47.)

19       Plaintiff initially started having mental health problems when he was 12, but never told

20   anybody because he was afraid "they would take him away."  (AR 44.)  As an adult, Plaintiff

21   started experiencing auditory and visual hallucinations, which caused him to call Fresno County

22   Mental Health ("Mental Health") for assistance.  (AR 43.)  He hears voices every day, telling him

23   he is worthless, no good, or horrible.  (AR 43.)  Sometimes he is in bed for three days, and the

24   voices tell him people are trying to hurt him.  (AR 44.)  He used to hear voices while working.

25   (AR 44-45.)  Plaintiff's medicine is reducing the auditory hallucinations, and giving him strength

26   to distinguish they are not real, avoid answering them, and move on to something else.  (AR 45.)

27   Plaintiff has never been hospitalized for psychiatric conditions.  (AR 44.)  He has been diagnosed

28   with schizophrenia "or something like that," and takes five medications.  (AR 38.)

In the past Plaintiff used PCP, methamphetamine, marijuana, alcohol, LSD, and cocaine. (AR 34.)  He completed a drug program when he was 13 and a three-month-long alcohol program when he was 24.  (AR 34.)   He has not participated in alcohol or drug related programs since, but was sent to a three month long DUI class which taught him about alcohol and accidents when he was approximately 35 or 36 years old.  (AR 35, 36.)   He was last arrested for a DUI about five years ago.  (AR 36.)   Plaintiff testified he was able to stop drinking alcohol and taking drugs because he "didn't want to live that type of life" anymore.  (AR 35.)  He does not recall if any treating personnel have told him his mental problems were related to his drug and alcohol use. (AR 37.)

Plaintiff was first incarcerated when he was 18 (approximately 1989), and most recently in approximately 2007.  (AR 33.)  Plaintiff testified he was on disability when he was 23 because he received six DUIs and was a severe alcoholic at the time.  (AR 32.)  Plaintiff spent five or six years in prison for DUIs, drug sales, and possession of a firearm.  (AR 32-33.)  Plaintiff is not on parole, last had a drug test about five years ago, and has not consumed alcohol or taken illegal drugs for about five years.  (AR 33-34.)  He is "really trying to get his life in order" and trying to take all his medications.  (AR 34.)

Except when he was thirteen and saw a counselor, Plaintiff was not treated for his psychological problems prior to seeing Dr. Oldham.  (AR 39.)  Plaintiff started seeing Dr. Oldham at Mental Health one year before the hearing (beginning April 2011), visiting him about once a month.  (AR 38, 39.)  Dr. Oldham told Plaintiff he is "going to have to learn to get better and try to get better to try to help [him]self" and take his medications.  (AR 39.)  Plaintiff takes Saphris, Risperdal, Klonopin, Toxil, and Protonix.  (AR 39.)   His side effects include some problems sleeping and being bothered by the sun.  (AR 40.)  Regarding Plaintiff's treating psychiatrist's suggestions for getting better, Plaintiff testified he "just got to keep trying, keep up with [his] medicine, keep up to go see [Dr. Oldham], keep up to go do the volunteer work, keep up to try to go to the meetings."  (AR 40.)

Plaintiff expressed interest in volunteering, and Dr. Oldham encouraged Plaintiff to volunteer and to go at his own pace.  (AR 41.)  Plaintiff briefly volunteered at the front desk of

1    Mental Health last year, but only completed one shift because he became very nervous and "got

2    paranoid." (AR 40.) Plaintiff attended some volunteer meetings after completing the shift. (AR

3    40.) Plaintiff went to "a few other groups" and has been taking walks to get out of the house and

4    be around other people. (AR 41.)

5           **2.     Vocational Expert Testimony**

6           Cheryl Chandler testified at the hearing as the vocational expert ("VE"). (AR 47-48.) The

7    VE testified Plaintiff's past work included caregiver, stocker, groundskeeper, and hacker. (AR 48-

8    49.) The ALJ asked the VE to assume a hypothetical person of Plaintiff's age, education, and

9    work experience, who is able to perform at all exertional levels, yet is limited to simple, routine

10   tasks and occasional public contact. (AR 49.) When asked if such a person would be able to

11   perform any work, the VE testified affirmatively regarding Plaintiff's past work of landscape

12   worker. (AR 49.) Also, the person could perform the work of a dish washer and lumber handler.

13   (AR 49-50.)

14          In a second hypothetical, the ALJ added that the person could only interact "occasionally"

15   (meaning he can be in close proximity to, but only occasionally interact with) coworkers and

16   supervisors. (AR 50.) The VE assessed the person could perform the jobs of lumber handler,

17   package sealer machine operator, and box bender. (AR 51.)

18          In a third hypothetical, the ALJ added that the person would miss four days of work per

19   month due to a combination of symptoms from mental impairments. (AR 51-52.) Also, as a

20   result of the same impairments, the person would be off task for 30 percent of the day. (AR 52.)

21   The VE responded the hypothetical person could not perform any work. (AR 52.)

22   **C.    The ALJ's Decision**

23          The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. §§

24   404.1520(a)(4), 416.920(a)(4). (AR 12-21.) The ALJ found Plaintiff met the insured status

25   requirements of the Social Security Act through December 31, 2012, and had not performed

26   substantial gainful activity as of or since September 15, 2010, the date Plaintiff alleged he became

27   disabled. (AR 14.) The ALJ found Plaintiff had the medically determinable impairments of

28   psychotic disorder NOS and polysubstance abuse. (AR 14.) She found none of Plaintiff's

impairments alone or in combination met or equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listing").  (AR 14-16.)  The ALJ next determined Plaintiff had the residual functional capacity ("RFC")[3] to perform a full range of work at all exertional levels, but with the non-exertional limitations to simple, repetitive tasks and occasional public contact.  (AR 16.)  Given his RFC, the ALJ determined Plaintiff could not perform his past relevant work as a caregiver, but could make a successful adjustment to other work existing in significant numbers in the national economy, such as landscape worker, dish washer, or lumber handler.  (AR 19-21).  The ALJ determined Plaintiff had not been under a disability from September 15, 2010, through the date of her decision.  (AR 21.)

**D.      Plaintiff's Contention on Appeal**

Plaintiff claims the ALJ erred in her consideration of both Dr. Oldham's opinion and Plaintiff's credibility.  (Doc. 16, 9-18.)

### III.  SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.  APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.*  §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.   *Id.* §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity ("RFC") despite the impairment or various limitations to perform her past work.   *Id.* §§ 404.1520(f), 416.920(f).   If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that

exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.  DISCUSSION

Plaintiff contends the ALJ improperly (1) afforded reduced weight to Dr. Oldham's opinion as his treating physician, and (2) discredited Plaintiff's testimony. (Doc. 16, 9.)

The Commissioner responds that the ALJ's decision to afford reduced weight to Dr. Oldham's opinion was supported by specific and legitimate reasons, and she properly determined Plaintiff's testimony was not credible. (Doc. 22, pp. 13, 16, 26.)

### A.  The ALJ Properly Afforded Reduced Weight to Dr. Oldham's Opinion

Plaintiff claims the ALJ failed to properly evaluate Dr. Oldham's January 2012 opinion. (Doc. 16, 9-10.) Plaintiff contends Dr. Oldham's opinion was entitled to special weight because he is a treating physician. As Dr. Oldham's opinion was uncontroverted by other physicians, the ALJ was required to articulate clear and convincing reasons to afford reduced weight to Dr. Oldham's opinions, but failed to do so. (Doc. 16, 13.) Plaintiff further contends the ALJ's proffered reasons for rejecting Dr. Oldham's opinion were not valid because the opinion was supported by the record. (Doc. 16, 13.)

The Commissioner responds that Dr. Oldham's January 2012 opinion was contradicted by other physicians' opinions; therefore the ALJ was required to articulate only specific and legitimate reasons for discrediting the opinion. (Doc. 22, 15-16.) Further, the ALJ properly afforded reduced weight to the opinion, citing substantial evidence that the opinion was not supported by the record. (Doc. 22, 15-16.)

#### 1.  Legal Standards Pertaining to Opinions of Treating Physicians

"By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." *Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir. 2007). "If a treating physician's opinion is 'well-supported . . . and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." *Id.* Even if a treating

physician's opinion is not given controlling weight, the opinion is still entitled to deference and the ALJ must consider specified factors in determining the weight it will be given, including (1) the length of the treatment relationship and the frequency of examination, and (2) the nature and extent of the treatment relationship. *Id.*  Additional factors relevant in evaluating the weight of any medical opinion, not just treating physician opinions, include: (3) the amount of relevant evidence that supports the opinion and the quality of the explanation provided, (4) the consistency of the medical opinion with the record as a whole, (5) the specialty of the physician providing the opinion, (6) and other factors such as the degree of understanding a physician has of Social Security disability programs and their evidentiary requirements and the physician's familiarity with other information in the record. *Id.*

If a treating physician's opinion is not contradicted by another doctor, it may only be rejected for clear and convincing reasons supported by substantial evidence. *Id.* at 632 (quoting *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998)).   If the treating physician's opinion is contradicted by another doctor, it may not be rejected unless the ALJ provides specific and legitimate reasons supported by substantial evidence. *Id.* (quoting *Reddick,* 157 F.3d at 725). The ALJ may provide substantial evidence by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Magallanes v. Bowen,* 881 F.2d at 747, 751 (9th Cir. 1989).  The ALJ must do more than offer conclusions; the ALJ must set forth their own interpretations and explain why they are correct. *Embrey v. Bowen,* 849 F.2d 418, 421–22 (9th Cir. 1988).

    **2.**      **The ALJ Was Required to Articulate Only Specific and Legitimate Reasons to Discredit Dr. Oldham's Opinion Because It Was Contradicted by Other Physicians' Opinions**

Plaintiff alleges Dr. Oldham's January 2012 opinion was "uncontroverted," and the ALJ was required to articulate clear and convincing reasons to discredit his opinion.  (Doc. 16, 13.) The Commissioner responds that Dr. Oldham's opinion was in fact controverted by several other doctors' opinions.

14

1    If a treating physician's opinion is contradicted by another physician, the ALJ must

2 provide specific and legitimate reasons supported by substantial evidence to reject the opinion.

3 *Reddick*, 157 F.3d at 725.

4    Dr. Oldham's opinion was contradicted by several other physicians' opinions.  On January

5 3, 2012, Dr. Oldham completed a mental impairment questionnaire for Plaintiff.  (AR 290-94.)

6 Dr. Oldham diagnosed Plaintiff with a psychotic disorder NOS and social phobia.  (AR 291.)  In

7 contrast to Dr. Oldham's opinion, Dr. Lewis, Dr. Soloman, and Dr. Garcia all opined Plaintiff did

8 not have any medically determinable mental impairment.

9    Dr. Oldham further opined Plaintiff: (1) had marked limitations in activities of daily living;

10 social functioning; and his ability to maintain concentration, persistence, or pace  (AR 292); (2)

11 had difficulty thinking or concentrating, an impaired memory, intense and unstable interpersonal

12 relationships, deeply ingrained maladaptive patterns of behavior, and emotional withdrawal or

13 isolation (AR 292); and (3) would have difficulty working at a regular job on a sustained basis

14 because he is distrustful of others, has difficulty in groups of people, and has a "hard time staying

15 on." (AR 294).   Dr. Lewis, Dr. Soloman, and Dr. Garcia all found Plaintiff significantly less

16 limited in functioning than Dr. Oldham's January 2012 opinion.  Dr. Lewis opined Plaintiff had

17 no significant limitation in his ability to understand and remember very short and simple

18 instructions; understand and remember detailed instructions; maintain concentration and

19 attention; accept instructions from supervisors and respond appropriately; sustain an ordinary

20 routine without special supervision; complete a normal workday and work week without

21 interruptions at a consistent pace; interact with coworkers; or deal with various changes in the

22 work setting.  (AR 233-34.)  Dr. Lewis assessed the likelihood that Plaintiff would emotionally

23 deteriorate in a work environment as minimal.  (AR 234.)  Both Dr. Soloman and Dr. Garcia

24 affirmed Dr. Lewis' opinion.  The ALJ gave great weight to the clinical findings and conclusions

25 of Dr. Lewis (AR 17), and moderate weight to both Dr. Soloman and Dr. Garcia (AR 18).

26    Because other physicians' opinions contradicted Dr. Oldham's January 2012 opinion, the

27 ALJ was required to articulate specific and legitimate reasons for affording Dr. Oldham's opinion

28 reduced weight.

**3.    The ALJ Properly Afforded Reduced Weight to Dr. Oldham's Opinion**

**a.    The ALJ identified specific and legitimate reasons for affording Dr. Oldham's January 2012 opinion reduced weight**

Plaintiff contends the ALJ improperly discredited Dr. Oldham's opinion.  (Doc. 16, 10.)  Plaintiff argues the ALJ's explanation for affording reduced weight to Dr. Oldham's opinion was too general because the ALJ failed to cite specific reasons for the decision.  (Doc. 16, 10.)  The Commissioner responds the ALJ's decision to discredit Dr. Oldham's opinion is explained with adequate specific and legitimate reasoning, and should be upheld.  (Doc. 22, 16.)

In determining how much weight to accord a medical opinion, the ALJ considers the opinion's consistency with, and support found within, the overall record.  *Orn*, 495 F.3d at 631; *see* 20 C.F.R. §§ 404.1527(c)(3), (c)(4), 416.927(c)(3), (c)(4).  An ALJ properly cites specific and legitimate reasons for rejecting a medical opinion "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Magallanes*, 881 F. 2d at 751 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

Although treating physicians' opinions are entitled to deference, when a physician's opinion is not supported by the treatment notes, objective medical findings, and conflicts with other medical opinions, the ALJ need not accept that opinion.  *Molina v. Astrue*, 674 F.3d 1104, 1111-12 (9th Cir. 2012); *see also, Thomas v. Barnhart*, 278 F.3d 948, 957 (9th Cir. 2002) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings"); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (ALJ properly rejected treating doctor's opinion that the claimant could not perform even sedentary work because "it was unsupported by rationale or treatment notes, and offered no objective medical findings to support the existence of [the claimant's] alleged conditions").

Here, the ALJ afforded reduced weight to Dr. Oldham's opinion because it was internally inconsistent with the record, completed largely on a check box form with very little explanation, and conflicted with Plaintiff's daily activities.  (AR 18.)  The ALJ first noted the January 2012 opinion was inconsistent, and contrasted sharply, with other evidence of record.  (AR 18.)  The

1    ALJ next underscored that Dr. Oldham's treatment notes from 2011 indicated Plaintiff

2    experienced only mild paranoia.  However, in contrast to the limitations of mild paranoia, Dr.

3    Oldham's January 2012 opinion inexplicably opined that Plaintiff experienced marked restrictions

4    in daily activities, social functioning, and concentration, persistence, and pace.  (AR 18.)  The ALJ

5    further noted that Dr. Oldham's opinion was largely a check box form, containing very little

6    explanation of the severe limitations.  For example, Dr. Oldham's explanation of why Plaintiff

7    would have trouble working a regular job on a sustained basis stated only that Plaintiff was,

8    "distrustful of others, [had] difficulty in groups of people, hard time staying on."  (AR 294.)  The

9    opinion indicated Plaintiff had no repeated episodes of decompensation within a 12- month period,

10   yet asserted that even a minimal increase in mental demands or change in environment would

11   cause Plaintiff to decompensate, without providing further explanation.  (AR 18.)

12        The ALJ further noted that, in contrast to Dr. Oldham's opinion that Plaintiff had a marked

13   limitation in activities of daily living, Plaintiff repeatedly acknowledged he walked daily, read

14   books, watched television, prepared meals, and shopped.  (AR 18, 45, 184-85, 233, 285, 291-92.)

15   Plaintiff paid his own bills, and completed household chores such as taking out the garbage,

16   washing dishes, and doing laundry.  (AR 15, 17-19.)  To the extent Plaintiff argues the ALJ's

17   rejection of Dr. Oldham's opinion was too general (Doc. 16, 10), the Court finds the ALJ cited to

18   substantial evidence explaining the reasoning for affording the doctor's opinion reduced weight.

19        Plaintiff cites *Embrey v. Bowen,* in which the Ninth Circuit reversed an ALJ's decision.  In

20   *Embrey,* the ALJ discredited a doctor's opinion because the medical opinions were not supported

21   by the objective findings, but the ALJ did not identify or analyze specific examples in the

22   decision.   849 F.2d 418, 421-22 (9th Cir. 1988) ("The ALJ must do more than offer his

23   conclusions.  He must set forth his own interpretations and explain why they, rather than the

24   doctors', are correct.").  This case is distinguishable from *Embrey*.  Here, the ALJ listed specific

25   reasons for discrediting the doctor's opinion, identifying specific inconsistencies between Dr.

26   Oldham's opinion and his treatment notes, Plaintiff's alleged symptoms and daily activities, and

27   lack of explanation in the doctor's opinion, as discussed above.  The ALJ discussed that Dr.

28   Oldham's explanations are brief and unsupported by the record, and properly afforded the opinion

1   reduced weight.   *Thomas*, 278 F.3d at 957 ("The ALJ need not accept the opinion of any

2   physician, including a treating physician, if that opinion is brief, conclusory, and inadequately

3   supported by clinical findings").

4            **b.      The ALJ properly relied on physicians' opinions in developing

5                     Plaintiff's RFC, and did not act as her own medical advisor**

6            Plaintiff contends the ALJ rejected the examining and reviewing physicians' opinions,

7   instead developing Plaintiff's RFC based on the ALJ's own opinion.   Plaintiff claims the ALJ

8   impermissibly acted as her own medical advisor by interpreting raw medical data in developing

9   Plaintiff's RFC.  (Doc. 16, 10.)

10           An ALJ may not substitute his or her own interpretation of the medical evidence for the

11  opinion of a medical professional.   *Tackett v. Apfel*, 180 F.3d 1094, 1102-03 (9th Cir. 1999).

12  However, an ALJ may rely upon selected portions of a medical opinion while rejecting other parts.

13  *See Magallanes*, 881 F.2d at 753.  *See also Russell v. Bowen,* 856 F.2d 81, 83 (9th Cir. 1988) ("It

14  is not necessary to agree with everything an expert witness says in order to hold that his testimony

15  contains 'substantial evidence.'")

16           In developing Plaintiff's RFC, the ALJ adopted Dr. Oldham's diagnosis of psychotic

17  disorder NOS, as well as Dr. Lewis, Dr. Soloman, and Dr. Garcia's assessments of the extent of

18  Plaintiff's limitations.  (AR 14, 267.)  The ALJ included Dr. Oldham's January 2012 diagnosis in

19  Plaintiff's RFC, but explained she afforded the extent of limitations in the opinion reduced weight

20  because they were inconsistent with the doctor's treatment notes, the opinion was a check-box

21  form offering very little explanation, and the limitations contrasted with Plaintiff's self-reported

22  daily activities.  (AR 18.)  Instead, the ALJ relied upon Dr. Lewis, Dr. Soloman, and Dr. Garcia's

23  opinions, to which she afforded great weight (Dr. Lewis' opinion) and moderate weight (Dr.

24  Soloman and Dr. Garcia's opinions), in formulating the extent of limitations for Plaintiff's RFC.

25  Contrary to Plaintiff's assertion, the only portions of the examining and reviewing physicians'

26  opinions the ALJ rejected were the physicians' diagnoses that Plaintiff did not have any mental

27  condition.  (AR 14.)

28

1   In sum, the ALJ did not act as her own medical advisor.  In developing Plaintiff's RFC, the

2   ALJ properly relied upon the portions of Dr. Oldham, Dr. Lewis, Dr. Soloman, and Dr. Garcia's

3   opinions which were supported by the record.

### c.   The ALJ properly considered inconsistencies between Dr. Oldham's opinion and the record, including GAF scores assigned to Plaintiff

6   Plaintiff contends the ALJ cites inconsistencies between the record and Dr. Oldham's

7   January 2012 opinion that should have been interpreted as being consistent with Plaintiff's alleged

8   symptoms.  (Doc. 16, 12-13.)  Plaintiff explains that he needs notes to remind him to take his

9   medications, does not cook, and was only able to last one day as a volunteer, and therefore his

10  self-reported activities do not negate his claims of disability.  (Doc. 16, 12-13.)  Plaintiff also

11  claims the GAF score assigned to him in March 2011 by Mr. Gay, the L.C.S.W. from Mental

12  Health, should be afforded weight because it is consistent with GAF scores assigned by Dr.

13  Oldham and Dr. Ramsey.  (Doc. 16, 12-13.)  These contentions lack merit.

### i.   The ALJ's interpretations are reasonable

15  Even if "the ALJ's interpretation . . . may not be the only reasonable one," so long as it is

16  "still a reasonable interpretation and is supported by substantial evidence" it is not the Court's

17  "role to second-guess it."   *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citation

18  omitted).  Accordingly, if the ALJ provides a reasonable interpretation of the evidence that is

19  supported by the record, the Court must affirm the decision.  *Id.*

20  To the extent inconsistencies between the record and Dr. Oldham's opinion could be seen

21  in a light more favorable to Plaintiff's disability claim, the ALJ cited specific reasons in affording

22  Dr. Oldham's opinion reduced weight.  The crux of Plaintiff's assertion is that the ALJ improperly

23  interpreted the evidence in the record against Plaintiff.  However, the ALJ's interpretation of the

24  evidence in the record is reasonable, and it is not the Court's role to second-guess it.  *See Rollins*,

25  261 F.3d at 857.

1           **ii.      The ALJ properly considered the GAF score given by Mr. Gay**

2           The ALJ is not required to give controlling weight to a treating physician's GAF score, and

3    an ALJ's failure to mention a GAF score does not render his assessment of a claimant's RFC

4    deficient.  *See e.g. Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir. 2002) ("While a

5    GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to

6    the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing

7    alone, does not make the RFC inaccurate."); *Petree v. Astrue,* 260 Fed.Appx. 33, 42 (10th Cir.

8    2007) (Unpublished Disposition) ("[A] low GAF score does not alone determine disability, but is

9    instead a piece of evidence to be considered with the rest of the record.")

10          Here, the ALJ considered Mr. Gay's GAF score in her decision despite the fact that Mr.

11   Gay is not a treating physician, explaining she afforded the GAF score little weight because it was

12   not consistent with the weight of the evidence.  (AR 17.)  Further, the ALJ afforded Dr. Oldham's

13   GAF score reduced weight because it was also inconsistent with the weight of the evidence, and

14   provided specific examples of the inconsistencies in her discussion of the medical evidence.  (AR

15   18.)  The ALJ articulated specific and legitimate reasons for rejecting the GAF determinations.

16   S*ee, e.g*., *Borrie v. Astrue,* 2009 WL 2579497, *2 (C.D.Cal.) ("[T]he ALJ considered the GAF

17   score, but finding such scores unreliable, did not find it mandated disability. This is a specific and

18   legitimate reason for discounting the score.").

19          **d.      Conclusion**

20          The ALJ properly afforded reduced weight to Dr. Oldham's January 2012 opinion because

21   it contradicted the doctor's own treatment notes, lacked support in the record, inadequately

22   explained its conclusions, and contradicted Plaintiff's self-reported daily activities.  In sum, the

23   ALJ provided specific and legitimate bases for rejecting Dr. Oldham's January 2012 opinion by

24   discussing the record and testimony, and indicating how the objective evidence pointed to more

25   mild conditions than those in Dr. Oldham's opinion.

26

27

28

**B.      The ALJ Properly Discredited Plaintiff's Testimony**

Plaintiff contends the ALJ failed to articulate legally sufficient reasons for rejecting Plaintiff's pain and subjective limitation testimony, and therefore, the Court should credit Plaintiff's testimony as true.  (Doc. 16, 18.)

The Commissioner responds that the ALJ provided adequate bases for discrediting Plaintiff's testimony, and the bases were supported by substantial evidence.  (Doc. 22, 17.)

**1.      Legal Standard**

An ALJ must engage in a two-step analysis in evaluating the credibility of a claimant's testimony regarding subjective pain.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Id.*  The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection.  *Id.*  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also, Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929.  Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

An ALJ's credibility finding must be properly supported by the record and sufficiently specific to assure a reviewing court that the ALJ did not arbitrarily reject a claimant's subjective testimony. *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc).   The ALJ's decision must contain specific reasons for the finding on credibility, supported by the evidence in the record, sufficiently specific to make clear the weight the adjudicator gave to the individual's statements and the reasons for that weight.  Social Security Ruling 96-7P.

> ### 2.    The ALJ Articulated Specific, Clear, and Convincing Reasons for Rejecting Plaintiff's Subjective Testimony

The ALJ found that Plaintiff's medically determinable impairment could reasonably be expected to cause his alleged symptoms.  (AR 18.)   The ALJ, however, determined Plaintiff's testimony about the intensity, persistence, and limiting effects of the symptoms was not credible to the extent it conflicted with the RFC.  (AR 18.)  The ALJ cited to Plaintiff's daily activities, an interview with the Social Security Administration, success with prescription drug treatment, his demeanor while testifying at the hearing, and inconsistent statements as factors in finding Plaintiff's testimony not credible.  (AR 18-19.)

Plaintiff contends the ALJ's bases for discrediting Plaintiff were inadequate and the ALJ, therefore, erred in discrediting his testimony.  (Doc. 16, 16-18.)  Plaintiff alleges (1) his activities of daily living do not translate to specific work functions and, therefore, the ALJ erred in his credibility finding; (2) the ALJ impermissibly isolated a "specific quantum of evidence" and ignored other relevant evidence in support of her decision; (3) the ALJ erred in noting Plaintiff's success with treatment in discrediting his testimony because he suffers from symptoms despite his medications; and (4) the ALJ erred by engaging in "sit and squirm" jurisprudence when the ALJ commented that Plaintiff's demeanor at the hearing was "generally unpersuasive."  (Doc. 16, 16-19.)

The Commissioner responds that the ALJ correctly determined that the record does not support Plaintiff's complaints of disabling mental health issues (Doc. 22, 17), and provided legally sufficient reasons supported by substantial evidence for rejecting Plaintiff's complaints (Doc. 22, 21).

### a.     The ALJ properly considered Plaintiff's daily activities

Plaintiff alleges his activities of daily living do not translate into specific work functions and, therefore, the ALJ erred in discrediting Plaintiff's testimony based on his daily activities. (Doc. 16, 18-19.)

An ALJ may consider "whether the claimant engages in daily activities inconsistent with the alleged symptoms." *Molina*, 674 F.3d 1104 (internal citation omitted); *Valentine v. Comm'r of Soc. Sec. Admin*., 574 F.3d 685, 694 (9th Cir. 2009) (ALJ properly determined claimant's "non-work activities . . . are inconsistent with the degree of impairment he alleges"); *Tommasetti*, 533 F.3d at 1039 ("The ALJ may consider many factors in weighing a claimant's credibility," including "the claimant's daily activities"); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (When evaluating the credibility of pain testimony, an ALJ may consider claimant's daily activities among other factors); SSR 96-7p (same).  An inconsistency between the level of activity reported by a claimant and the claimant's alleged limitations is a factor that bears on credibility.  *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

Here, the ALJ found Plaintiff's activities of daily living were inconsistent with the severity of symptoms he alleged and disabling mental impairments.  (AR 19.)  The ALJ noted Plaintiff's daily activities were "not as limited as one would expect" given Plaintiff's testimony of  disabling symptoms, and that Plaintiff walks, eats breakfast, watches television, washes dishes, and does laundry.  (AR 19.)  Additionally, Plaintiff prepares his own meals, grocery shops, takes out the garbage, and pays bills.  (AR 19.)  Further, Plaintiff stated he did not spend time with others, yet lived in a house with his sister and her two children, attended group therapy, grocery shopped, and volunteered at an information desk.  (AR 15, 17-19, 31, 39-40, 260-61, 263, 281, 283.)   He claimed he could not pay attention, follow written or spoken instruction or remember a lot of things, yet he could sustain the concentration and memory to read, watch two to three hours of television, manage his personal finances, perform household chores, and prepare meals.  (AR 15, 17-19, 45, 182, 184-85.)   To the extent Plaintiff alleges his activities of daily living do not translate into specific work functions and, therefore, the ALJ erred in his credibility finding, his argument is not convincing.  (Doc. 16, 18-19.)

Plaintiff contends the ALJ erred in discrediting Plaintiff's testimony based on his daily activities because his daily activities do not translate into specific work functions.   However, Plaintiff misstates the ALJ's findings.   While the ALJ did not explain that Plaintiff's daily activities were *consistent* with specific work activity, the ALJ found Plaintiff's daily activities were *inconsistent* with the severity of symptoms he alleged.  (AR 19.)   Because Plaintiff's daily activities were inconsistent with the disabling symptoms he alleged, the ALJ properly found such claims not credible.   *Burch*, 400 F.3d at 680 (ALJ properly discounted credibility where he "explained that [the claimant's] daily activities 'suggest that she is quite functional.  She is able to care for her own personal needs, cook, clean and shop.  She interacts with her nephew and her boyfriend. She is able to manage her own finances and those of her nephew'"); *see also Ortiz v. Astrue*, CV07-05640OP, 2009 WL 1202890, *7-*8 (C.D. Cal. Apr. 29, 2009).

### b.      The ALJ properly considered Plaintiff's Social Security interview

Plaintiff contends the ALJ erred by referencing only one of Plaintiff's three Social Security Administration ("SSA") interviews in the decision, and improperly relied upon a "specific quantum of evidence" in making the credibility finding, while ignoring other relevant evidence.[4] (Doc. 16, 16-17.)  To the extent Plaintiff argues the ALJ erred in citing to one SSA interview and not the others, thereby demonstrating a failure to look at the record as a whole, his argument is not convincing.

In discrediting Plaintiff's testimony, the ALJ noted that during Plaintiff's SSA interview, the interviewer did not perceive any manifestations of Plaintiff's alleged symptoms.  (AR 19.) Plaintiff argues the ALJ should not have "ignored" another SSA interviewer's notation that Plaintiff was difficult to interview and a third interviewer's comments that Plaintiff came in asking

---

[4] Plaintiff states "[t]he Commissioner['s] reasoning is in error because [s]he has isolated a specific quantum of evidence and has ignored other relevant evidence to support of h[er] determination."  (Doc. 16, 16.)  For this proposition, Plaintiff cites *Gallant v. Heckler*, 753 F.2d 1450, 1455 (9th Cir. 1984); *Reddick v. Chater* 157 F 3d 715,720 (9th Cir. 1998); and *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir.1975).  *Gallant* and *Reddick* explain that the Court must look to the whole record in reviewing an ALJ's decision, and *Day* addresses that an ALJ must set forth specific reasons for rejecting a doctor's uncontroverted opinion.  Here, the ALJ's decision sets forth specific and legitimate reasons for the ALJ's decision, and the ALJ is not required to discuss each piece of medical evidence in the record.  *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003).  As explained throughout this Order, the ALJ's decision suggests that the ALJ reviewed the record in its entirety and made a decision regarding Plaintiff's disability based upon consideration of all the evidence.

1   for help with completing his appeal.  (Doc. 16, 16-17.)  Contrary to Plaintiff's assertion, however,

2   the ALJ is not required to analyze each of Plaintiff's interviews in her written decision.  *See*

3   *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (ALJ is not required to

4   discuss every piece of medical evidence contained in the record.).  The fact that the ALJ discussed

5   one interview expressly does not indicate the others were ignored.

6                      **c.      The ALJ properly considered Plaintiff's success with treatment**

7          Plaintiff asserts the ALJ erred in noting his success with treatment, because he still suffers

8   from symptoms while on medication, as evidenced by his inability to volunteer for more than one

9   day and GAF scores indicating severe impairments.  (Doc. 16, 17.)

10         Impairments which can be controlled effectively with medication are not disabling for the

11  purpose of determining eligibility for benefits.  *Warre v. Comm'r of Soc. Sec. Admin*., 439 F.3d

12  1001, 1006 (9th Cir. 2006) (internal citation omitted).  As the ALJ's decision noted, Plaintiff's

13  medical records and testimony confirm he is having success with treatment.  (AR 19.)  The ALJ

14  specifically noted that Plaintiff reports he still hears voices, but they are much better, and he is

15  also less paranoid.  (AR 19.)  At his hearing, Plaintiff testified that "[the medication is] reducing

16  the voices where I can't hear them and it's giving me the strength to say it's not real and try to do

17  something else and avoid them."   (AR 45.)   Plaintiff repeatedly acknowledged his condition

18  improved with medication and that his medications did not cause adverse side effects that would

19  preclude sustained work activity.  (AR 19, 261-64, 266, 268, 283, 285, 287.)

20         Because Plaintiff's mental impairment improved with medication, the ALJ did not err in

21  citing his success with treatment among the reasons for discrediting Plaintiff's testimony.  (AR

22  19.)

23                      **d.      The ALJ's consideration of Plaintiff's demeanor during the hearing
                                  was not improper**
24

25         Citing *Day v. Weinberger*, Plaintiff contends the ALJ impermissibly engaged in "sit and

26  squirm" jurisprudence by commenting that Plaintiff's demeanor at the hearing was "generally

27  unpersuasive."  522 F.2d 1154, 1156 (9th Cir. 1975).  (Doc. 16, 17.)  This contention lacks merit.

28

In *Day* the court reversed an ALJ's decision denying benefits because the ALJ relied upon a plaintiff's failure to exhibit manifestations of prolonged pain at her hearing. *See Day,* 522 F.2d at 1156. ("[T]he examiner noted that during Day's appearance at the hearing, she did not exhibit the physical manifestations of prolonged pain that are listed in a leading medical textbook.") Here, unlike *Day*, the ALJ specifically emphasized that Plaintiff's "generally unpersuasive" behavior at the hearing was only one among many factors upon which she relied in assessing the credibility of Plaintiff's testimony, and the factor was not determinative. (AR 19.)

### e. The ALJ properly considered Plaintiff's inconsistent statements in assessing Plaintiff's credibility

The ALJ's credibility analysis also considered Plaintiff's inconsistent statements. (AR 15, 17-19.) An ALJ may consider inconsistencies between a claimant's statements in rejecting subjective claims. *Molina*, 674 F.3d at 1112; *Thomas*, 278 F.3d at 958-59 (inconsistencies in a claimant's testimony may be used to discredit subjective complaints). Inconsistencies or internal conflicts in Plaintiff's statements are a clear and convincing reason to give less weight to those statements. *See Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), *as amended on September 17, 1997* (in weighing plaintiff's credibility, the ALJ may consider "inconsistencies either in [plaintiff's] testimony or between his testimony and his conduct"); *see also Fair v. Bowen*, 885 F.2d 597, 604 n.5 (9th Cir. 1989) (an ALJ can reject pain testimony based on contradictions in plaintiff's testimony).

The ALJ noted inconsistencies within the record regarding Plaintiff's statements about his drug abuse and mental health treatment history, as well as the reason for the termination of his employment. (AR 18.) For example, Plaintiff claimed auditory hallucinations since childhood, yet never reported them to his mental health providers. (AR 18.) He claimed he had received mental health treatment for at least three years, yet his records reflect only two appointments between May 2009 and February 2011. (AR 18.) Further, Plaintiff reported to Dr. Lewis he had stopped using drugs and alcohol when he was 37 years old (in approximately 2008), yet told the ALJ he had stopped prior to 2007. (AR 18, 34.) Regarding his criminal record, Plaintiff told the ALJ he served between five or six years in jail for DUIs, drug sales, and possession of a firearm;

1   he indicated to Dr. Lewis he had four arrests and two years of incarceration.   (AR 33, 230.)

2   Plaintiff testified he was awarded disability benefits in 1994 on the basis of an alleged substance

3   abuse disorder after he was convicted for six DUIs (AR 32), however Agency records indicate his

4   application was denied (AR 170-72).

5          Because Plaintiff's testimony contradicted his statements throughout the record, and the

6   record also contained internal inconsistencies, the ALJ reasonably questioned his credibility.

7   *Johnson*, 60 F.3d at 1434 (the ALJ properly "cited several instances of contradictions within the

8   claimant's own testimony" in finding her not credible).   Thus, the ALJ properly identified and

9   considered the inconsistencies between Plaintiff's testimony and the record in assessing Plaintiff's

10   credibility.

11                     **f.       Conclusion**

12          The ALJ cited Plaintiff's inconsistent daily activities and statements, successful treatment

13   with prescription medications, and general demeanor in determining Plaintiff's testimony was not

14   fully credible.   (AR 19.)   The ALJ also noted that during an in-person interview, the SSA

15   interviewer did not observe or perceive Plaintiff to have any challenges hearing, reading,

16   breathing, understanding, concentration, or talking, among other criteria. (AR 19.)   When, as here,

17   the ALJ's interpretation of the claimant's testimony is reasonable and supported by substantial

18   evidence, it is not the Court's role to "second-guess" it.   *Rollins v. Massanari*, 261 F.3d 853, 857

19   (9th Cir. 2001).

20          The ALJ cited clear and convincing reasons for rejecting Plaintiff's testimony regarding

21   the intensity and limiting effects of his symptoms.   Moreover, as the ALJ's reasons were properly

22   supported by the record and sufficiently specific, the ALJ properly rejected Plaintiff's testimony

23   on permissible grounds and did not arbitrarily discredit Plaintiff's testimony.

24                 **VI.  CONCLUSION AND ORDER**

25          Based on the foregoing, the Court finds the ALJ's decision is supported by substantial

26   evidence of the record as a whole and is based on proper legal standards.   Accordingly, the Court

27   DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social

28

Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff Bronson Lopez.


IT IS SO ORDERED.

    Dated:   **July 7, 2014**                      **/s/ Sheila K. Oberto**

                                          UNITED STATES MAGISTRATE JUDGE